1

**Ryan Dean Gabriel,** *Pro Se*
2000 Blacktail Road, #1140
Lakeside, MT 59922
Telephone: (206) 391-9886 m.
rgabriel@zurccapital.com

2

3

4

5

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MONTANA**
MISSOULA DIVISION

6

7

RYAN DEAN GABRIEL,                )        Civil No. _____

8

        Plaintiff,                )

9

        vs.                       )        **COMPLAINT AND CLAIM /
                                           PRAYER FOR DECLARATORY
                                           AND INJUNCTIVE RELIEF**

10

DORINDA SUE GRAY, INSURED         )

11

TITLES, LLC /DBA INSURED TITLES,

TITLE INSURANCE CORPORATION       )

12

/DBA INSURED TITLES, TAYLOR KAI

GROENKE, and FREDERICK J. "FRITZ" )

13

GROENKE /DBA MONTANA REAL

ESTATE GROUP,                     )

14

        Defendants.               )

15

16

--------------------------------------------------------)

17

18

        Plaintiff Ryan Dean Gabriel brings this Complaint against the above-named Defendants,

19

and states the following in support thereof:

20

**PRELIMINARY STATEMENT AND FACTUAL BACKGROUND**

21

        1.        On August 13, 2024, and August 14, 2024, Defendant Dorinda Sue Gray ("M/r/s.

22

Gray"), acting on her own behalf and under the authority of her employer, Insured Titles, LLC

23

/dba Insured Titles, a subsidiary of Defendant Title Insurance Corporation, sent a series of e-mail

24

messages to Defendant Frederick "Fritz" Groenke ("Mr. Groenke") in which M/r/s. Gray

25

knowingly colluded with Mr. Groenke to illegally remove Plaintiff Ryan Dean Gabriel ("Mr.

26

Gabriel") from the title and deed to his permanent residence and home, located at 2000 Blacktail

27

Road in Lakeside, MT 59922.  Specifically, M/r/s. Gray suggested that Mr. Groenke seek

28

"allocation of proceeds and a quit title action from the courts removing [Plaintiff] Ryan from the property. Please advise." (*See* **Exhibit 27**, attached here).

2.    Previously, on July 26, 2024, at 3:56pm MST, Plaintiff Mr. Gabriel spoke directly to Defendant Dorinda Sue Gray, on a recorded call, in which M/r/s. Gray emphatically reassured Mr. Gabriel that it was "impossible" for him to be removed from the title to his permanent home "without you signing the Warranty Deed", further reassuring Plaintiff that "title theft" as heard on radio advertisements for Home Title Lock™ were "not really a thing", and that Mr. Gabriel "would be made aware of any attempts to remove [him] from title by the title company [Defendant Insured Titles, LLC /dba Insured Titles]". Simultaneously, Defendant M/r/s. Gray was secretly and proactively coordinating with Defendant Frederick "Fritz" Groenke to explore creative ways of removing Mr. Gabriel from the title to his own permanent residence, ostensibly so that Mr. Groenke could list and sell the property out from underneath him. (*See* **Exhibit 27**, attached here).

3.    Prior, on or around July 23, 2023, Federick "Fritz" Groenke, a notorious local realtor and alleged biological father of a local attorney, Defendant Taylor "Kai" Groenke, listed Plaintiff Mr. Gabriel's permanent residential home and own real property at 2000 Blacktail Rd. in Lakeside, MT 59922 – without his consent – on Zillow.com, Redfin.com, Realtor.com and elsewhere, via Montana Regional MLS, LLC (among other avenues), by invoking an Oregon lower court judgment. This Amended General Judgment has been the subject of an Oregon trial court Stay by Supersedeas Undertaking since prior to the time of the listing in question, and which is currently pending in the Oregon Court of Appeals. (*See* **Exhibit 2**, attached).

4.    Defendant Frederick "Fritz" Groenke did not have legal authorization to list the property at the time of its listing on July 23, 2024, nor at the time of the subsequent temporary withdrawal and re-listing weeks later, and he was advised as much by Mr. Gabriel's Oregon attorney (Andrew Newsom, Partner – Holtey Law Firm). Mr. Groenke listed it anyway, in active coordination with Defendant M/r/s. Gray, who acted under the authority of Defendant Insured

Titles, LLC.  (*See* **Exhibit 3**, attached).  The above sequence of events has precipitated the need for the instant Complaint and Claim for Declaratory and Injunctive Relief by this Federal Court.

**PARTIES**

5.     Plaintiff, RYAN DEAN GABRIEL (hereinafter referred to as 'Mr. Gabriel') at all times relevant hereto, is an individual residing at 2000 Blacktail Road, Lakeside, Montana 59922.

6.     Defendant, DORINDA SUE GRAY acting through her employer, INSURED TITLES, LLC /DBA "INSURED TITLES", licensed and vested with the powers of the State of Montana to record, strike, perpetuate and assist with the enforcement of real property title is subject to the personal jurisdiction of this Court pursuant to Fed. R. Civ. P. 4(k)(2)(A) and (B). At all times relevant hereto, Defendant DORINDA SUE GRAY is/was acting under color of law, and resides at 802 Columbia Ave., Whitefish MT 59937.

7.     Defendant, INSURED TITLES, LLC /DBA "INSURED TITLES", licensed and vested with the powers of the State of Montana to record, strike, perpetuate and assist with the enforcement of real property title in Montana and Idaho is subject to the personal jurisdiction of this Court pursuant to Fed. R. Civ. P. 4(k)(2)(A) and (B).  At all times relevant hereto, Defendant INSURED TITLES, LLC / DBA INSURED TITLES is/was acting under color of law, and is located at 1724 Fairview Missoula, Montana 59801.

8.     Defendant, TITLE INSURANCE CORPORATION /DBA "INSURED TITLES", is the parent company of INSURED TITLES, LLC /DBA "INSURED TITLES", and is licensed and vested with the powers of the State of Montana to record, strike, perpetuate and assist with the enforcement of real property title in Montana and Idaho is subject to the personal jurisdiction of this Court pursuant to Fed. R. Civ. P. 4(k)(2)(A) and (B).  At all times relevant hereto, Defendant TITLE INSURANCE CORPORATION is/was acting under color of law, and is located at 195 South Broadway, PO Box 580, Blackfoot, ID 83221.

9.     A third party, Zurc Capital, LLC (hereinafter referred to as 'Zurc') at all times relevant hereto, is a duly formed limited liability corporation of the State of Wyoming, located at 20 N. Gould Street, Suite N, Sheridan, Wyoming 82801.

10.    Defendant, FREDERICK "FRITZ" J. GROENKE /dba MONTANA REAL ESTATE GROUP (hereinafter "Mr. Groenke") at all times relevant hereto, is:

(a)    a self-described real estate broker doing business under the laws of the State of Montana, the assumed name certificate for which is currently active, and who asserts authorization to do business under the alleged license #RRE-BRO-LIC-1435 in this State of Montana, and thus is subject to service of process pursuant to the laws of the State of Montana. (*See* **Exhibit 24**, attached).

(b)    an adult citizen of the State of Montana who resides at 246 Flathead Lake Place, Bigfork, MT 59911, does business from 553 Electric Ave., Bigfork, MT 59911 and is subject to service of process pursuant to the laws of the State of Montana.

11.    Defendant, TAYLOR KAI GROENKE (hereinafter "M/r/s. Groenke") at all times relevant hereto, is:

a)    a licensed, active Montana State Bar Association member and self-described family law attorney doing business under the laws of the State of Montana under the name "Law Office of Kai Groenke", in this State of Montana, and thus is subject to service of process pursuant to the laws of the State of Montana.

b)    an adult citizen of the State of Montana who resides at 12 Whitetail Meadows Road, Kalispell, MT, and does business from 239 2nd Street West in Kalispell, MT 59901 and is subject to service of process pursuant to the laws of the State of Montana.

12.    A third party, GROENKE HOLDINGS, LLC, at all times relevant hereto, is the holding company through which liability insurance, business licensing and other registration

activities are conducted by Defendant TAYLOR KAI GROENKE (i.e., it is M/r/s. Groenke's *alter ego*), does business at 239 2nd Street West in Kalispell, MT 59901 and is subject to service of process pursuant to the laws of the State of Montana. (*See* **Exhibit 25**, attached).

13.     A third party, MONTANA REGIONAL MLS, LLC, is the listing service provider and authority through which Plaintiff Mr. Gabriel's permanent residence was improperly and fraudulently listed, does business from 1517 S. Reserve St., Missoula, MT 59801, its CEO is Justin Ponton (hereinafter "Mr. Ponton"), and is subject to service of process pursuant to the laws of the State of Montana. (*See* **Exhibit 26**, attached).

14.     A third party, JESSE MARK OLSEN ("Mr. Olsen") is a co-owner of Plaintiff Mr. Gabriel's permanent residence at 2000 Blacktail Road in Lakeside, MT 59922, is listed as tenants in common on the property with Mr. Gabriel and who also has 50/50 title to the property. Mr. Olsen, at all times relevant hereto, is an adult citizen of the State of Oregon who resides at 650 S. Gaines Street, Unit 1914, Portland OR 97239.

15.     A third party, Roscoe C. Nelson, Jr. (hereinafter referred to as 'Mr. Nelson'), doing business as sole proprietorship 'Nelson & Nelson', at all times relevant hereto, is a lawyer and non-incorporated business (sole proprietorship) doing business under the laws of the State of Oregon, the assumed name certificate for which has been revoked since February 23, 2023, and is also an adult citizen of the State of Oregon who resides at 2903 SW Fairview Boulevard, Portland, Oregon 97205.  Mr. Nelson represents third party Mr. Olsen in Oregon.

## JURISDICTION AND VENUE

16.     This action arises under the U.S. Constitution, 42 U.S.C. § 1983.

17.     This Court has subject matter jurisdiction pursuant to Article III of the U.S. Constitution and 28 U.S.C. §§ 1331, because this case arises under the Fourteenth Amendment to the United States Constitution and because Plaintiff Mr. Gabriel seeks redress of his civil rights under 28 U.S.C. § 1343.

18.     This Court is empowered by 28 U.S.C. §§ 2201 and 2202 to grant declaratory as well as other forms of relief, including permanent injunctive relief, necessary to remedy the alleged constitutional violations.

19.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331.

20.     Venue of this district is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims have and continue to occur in this district and Plaintiff and Defendants are in the State of Montana.  Assignment to the Missoula Division is proper because Plaintiff is a permanent resident of Flathead County, Montana.

### FACTUAL BACKGROUND (CONTINUED)

21.     Defendant Mr. Groenke was officially provided notice on August 23, 2024, by the Northwest Montana Association of REALTORS ("NMAR") that his actions were the subject of a disciplinary hearing.  NMAR wrote, "The Grievance Committee Panel met August 21, 2024, to review the complaint and, after full and careful consideration, referred the ethics complaint alleging a violation 1, 3 and 12 to the Professional Standards Committee for a hearing. Please see a copy of Grievance Committee Report attached (Form #E-5.1)." (*See* **Exhibit 28**, attached).

22.     Plaintiff Mr. Gabriel had previously submitted that ethics complaint following a sequence of events in which Mr. Groenke was preparing an illegal listing of his property, which Mr. Gabriel became aware of on July 23, 2024.  That same day, Mr. Gabriel also witnessed the electronic gate that Mr. Groenke forcibly broke by forcing his way through it, along with the unauthorized listing of Mr. Gabriel's property, accompanied by the misleading and far-outdated photos from 2019 that Mr. Groenke illegally used in his listing – photos that still belong to Cecil Waati, another local realtor.  (*See* **Exhibit 11**, attached).

23.     According to local Defendant Taylor "Kai" Groenke, her client, Jesse Mark Olsen (hereinafter "Mr. Olsen") had previously hired Frederick "Fritz" Groenke, the alleged biological father of Taylor "Kai" Groenke, to attempt to sell Plaintiff Mr. Gabriel's permanent residence.

Montana Regional MLS, LLC, then listed the real property at 2000 Blacktail Road, Lakeside, MT 59922 for sale and the property is now under contract, as of August 9, 2023.  This was done without Plaintiff Mr. Gabriel's consent, and with the lower court Stay (Supersedeas Undertaking) still in place.  (*See* **Exhibit 26** *and* **Exhibit 3**, attached).

24.    Mr. Gabriel filed supersedeas undertakings in the trial court file on July 2 and July 7, 2024. The undertakings include the following language: "appellant will not commit waste or allow waste to be committed on the real property while the appellant possesses and has access to the property, and the appellant will pay the value of the use and occupation of the property, in addition to half of the maintenance costs, for the period of possession if the judgment is affirmed." The undertakings also stated a proposed value for the use/occupation of the property. Under Oregon law, ORS 19.335 (2), "If a judgment requires the transfer or delivery of possession of real property, a supersedeas undertaking acts to stay the judgment if the undertaking provides that the appellant will not commit waste or allow waste to be committed on the real property while the appellant possesses the property, and the appellant will pay the value of the use and occupation of the property for the period of possession if the judgment is affirmed. The value of the use and occupation during the period of possession must be stated in the undertaking." (*See* **Exhibit 17** *and* **Exhibit 3**, attached).

25.    Accordingly, the Oregon judgment is automatically stayed by the filing of the supersedeas undertakings, and no one has authority to list the Montana residence for sale during the period in which the supersedeas undertaking Stay is in place.  (*See* **Exhibit 17**, attached).

26.    Compounding the illegal and/or extralegal listing of Plaintiff Mr. Gabriel's property and permanent residence (2000 Blacktail Road, Lakeside, MT 59922), Defendant Frederick "Fritz" Groenke illegally impersonated another realtor (Michelle Thomson), deliberately using her signature and then substituting her 'Reply' address ('michellethomson.bigfork@gmail.com') with his own ('mtreg@cyberport.net').  **Mr. Groenke**

**then attempted to walk back the attempted fraudulent conveyance, actions described by Kaaren Winkler, MPA, RCE, CAE and Chief Executive Officer of the Montana Association of REALTORS as "serious", "troubling" and "severe"**. (Emphasis added.) (*See* **Exhibit 1** and **Exhibit 19**, attached).

27.    In other words, on August 3, 2024, at approximately 4pm MST, Defendant Frederick "Fritz" Groenke impersonated another realtor, Michelle Thomson (a federal, state and local crime), in the process of committing numerous other felonies, including illegal trespass (under Montana Penal Code 45-6-203), vandalism, breaking and entering and harassment, among other crimes.  These actions also constitute rank violations of Article 1 & Article 3 of the National Association of Realtors (NAR) Code of Ethics:  Unauthorized Access to Property, SOP 1-16 and 3-9. (*See* **Exhibit 1** *and* **Exhibit 18**, attached).

28.    Mr. Groenke is also illegally using misleading and outdated photographs that are owned by another local realtor, Cecil Waati, for which he did not receive permission and which wildly misrepresent the property in its present state.  For example, the entire kitchen in the 2nd cabin is being gutted by a restoration company for an insurance claim caused by leaking fittings underneath the kitchen sink and adjacent bathroom sink.  The entire floor is torn out, along with the kitchen cabinetry and appliances, and that project is not scheduled to be completed until early November 2024 (photos attached of the mitigation underway). In addition, the mitigation company has tested for mold and the entire sub-floor between the kitchen in the 2nd Cabin and the Garage was plastered with toxic mold, and so the entire lower ceiling has been gutted and will be drying out for weeks.  (*See* **Exhibit 14**, attached).

29.    Compounding matters, the insurance company has stated it will not continue to reimburse any repairs or claims that stem from the water leakage incident if the property is pending a contractual sale.  Beyond these issues, insurance coverage for the property was dropped in January 2024 due to the water leakage incident, and so any prospective buyer will

not have continuity of insurance coverage as a result of these damages, dramatically lowering the purchase/sale price of the property under the current conditions (leaving aside the fact that Mr. Gabriel currently resides at the property and it is his permanent home). (*See* **Exhibit 15**, attached).

30.     Furthermore, the aerial photos published on the listing are fraudulent in the sense that the 'wilderness' photos are now fully developed properties. Finally, there is a 3' X 3' square hole in the pump house ceiling which was cut to allow a crane to access and fix the well pump. (*See* **Exhibit 14**, attached).

31.     Not only does this act constitute substantive fraud and misrepresentation, but the listing is also a clear violation of the National Association of Realtors (NAR) Code of Ethics Article 12: Displays of Competitor's Content and Listings. (*See* **Exhibit 1**, attached).

32.     Michael Ponton, CEO of the Montana Regional MLS, was made aware of the correspondence from Plaintiff Mr. Gabriel's Oregon attorney, Andrew Newsom, which stated that at the time of the listing in question an active Court stay (supersedeas undertaking) was in place on a judgment that Fritz Groenke purported to rely on to justify the illegal listing. That listing has never been taken down, and the court stay is still in place. (*See* **Exhibit 3**, attached).

33.     The full forwarded e-mail exchange incriminating Mr. Groenke in the above is attached as Exhibit 1. (*See* **Exhibit 1**).

34.     Previously, on Friday, July 19, 2024, counsel for Oregon resident Mr. Olsen, Taylor "Kai" Groenke ("M/r/s. Groenke") filed for a Temporary Petition for Protective Order with the Justice Court of the State of Montana (Flathead) before Hon. Paul Sullivan, Justice of the Peace. In this Protective Order, Taylor "Kai" Groenke sought a ruling that would require Plaintiff Mr. Gabriel "shall stay at least 2,500 feet from … 2000 Blacktail Road, Lakeside, MT 59922" – which happens to be Mr. Gabriel's permanent residence and home, and which he owns, has title to, and lives in. (*See* **Exhibit 4**, **page 2**, attached). M/r/s. Groenke's husband is David

C. Dowell, who happens to work for the Flathead County Probation and Parole office, which in turn works closely with Hon. Paul Sullivan's Justice Court. In other words, M/r/s. Groenke is trying to use her husband's connections adjacent to Hon. Paul Sullivan, Justice of the Peace, and the Flathead County Justice Court, to evict Plaintiff Mr. Gabriel from his own home ostensibly so that her father, Frederick "Fritz" Groenke (a realtor) can sell it out from underneath Mr. Gabriel for some undisclosed commission. (*See* **Exhibit 4**, attached).

35.     Ultimately, Defendant M/r/s. Groenke did not succeed in securing Plaintiff Mr. Gabriel's eviction from his own home by means of her sought-after Protective Order. That effort having failed, Defendant Taylor "Kai" Groenke then dramatically escalated matters yet further by demanding the local District Court (Flathead County, Montana) "**impose criminal sanctions upon Ryan, including incarceration, for the protection of the public, Jesse, his attorneys, the realtors, potential buyers, the home inspectors, and any other person who may need access to the real property [Plaintiff Mr. Gabriel's permanent residence at 2000 Blacktail Road in Lakeside, MT 59922] or is otherwise involved in the marketing and sale of the property. (…) Ryan should be incarcerated until such time as the sale of the property closes. (…) Finally, Ryan will be more easily served with process and documents as a resident of Flathead County Jail until the transaction can be completely closed.**" (Emphasis added.) (*See* **Exhibit 29**, attached).

36.     Rewinding back to the origin of this ongoing Complaint: On March 22, 2022, Oregon resident Jesse Mark Olsen ("Mr. Olsen"), by and through his attorney Roscoe C. Nelson, Jr. (III) ("Mr. Nelson"), filed a civil family lawsuit in Multnomah County, Oregon (Case No. 22DR04942), against Plaintiff Ryan Dean Gabriel ("Mr. Gabriel") alleging that Mr. Gabriel and Mr. Olsen were "spouse[s]" having entered into an implied "domestic partnership" or "marriage" for 12 years starting in 2010, seeking dissolution of the alleged unregistered domestic partnership.

37.     That lawsuit is pending appeal, and the injuries created by the lawsuit are ongoing. The initiation of injuries substantially began when Plaintiff Mr. Gabriel's *'Motion to Dismiss'* was denied by the local Circuit Court on August 16, 2022, and injuries became more acute and compounded when Plaintiff Mr. Gabriel's *'Special Motion to Strike'* was denied by the local Circuit Court on April 19, 2023.  Trial was held on January 26, 2024, and February 14, 2024, an Order was issued by the trial Court on April 17, 2024.  An Amended General Judgment was ultimately entered on May 23, 2024, and a stay was issued on that judgment on July 7, 2024.

38.     Mr. Olsen through his attorney has since backpedaled these allegations as discovery and the trial has unfolded, now asserting that Mr. Gabriel and Mr. Olsen were merely in an unregistered domestic partnership per Oregon's controversial *'Beal v. Beal'*[1] case law precedent, even though Oregon is neither a common law marriage state nor a "community property" jurisdiction.  The local court under Hon. Judge Patrick Henry appeared to walk the core claims back yet further, suggesting that mere temporary cohabitation may be the central question, stating to Mr. Gabriel at trial, "You seem to be preoccupied with the term 'domestic partnership'.", but still ruled that the parties were in an unregistered domestic partnership.

39.     Prior to receipt of Mr. Olsen's *'Summons'*, which began with the proclamation, "Your spouse has filed a Petition asking for a dissolution of your marriage", Mr. Gabriel had not ever once considered the viability of anything resembling "unregistered domestic partnership" laws in Oregon, which does not recognize common law marriage, is not a community property state, and in which he does not reside.  Mr. Gabriel has been a resident of Montana since Feb. 2021, and prior to that was a resident of Washington State, stretching back to 2001.

40.     Mr. Gabriel has a Montana Drivers' License, files his taxes in Montana, has a Montana vehicle license, and his employers from 2002 onwards have only known him to reside

---

[1] In *'Beal v. Beal'*, 282 Or. 115, 577 P.2d 507 (Or. 1978), the Oregon Supreme Court ruled that the property of unmarried cohabitants should be equitably distributed according to the parties' intent, rather than by title or possession.

in Washington State and Montana.  All payroll taxes and employment-related taxes for Mr. Gabriel have been paid to and recorded in Washington State and Montana since 2002 to present, and Mr. Gabriel has only been eligible for unemployment and other related state benefits in Washington State and Montana since 2002 to present.  Additionally, Mr. Gabriel has only ever voted in Washington State and Montana since 2002 and has never held an Oregon State identification card, nor an Oregon vehicle license plate.  Mr. Gabriel categorically denies being married to Mr. Olsen, nor ever once signaling his intent to enter into a domestic partnership under Oregon law, including *'Beal v. Beal' Id.,* which appears to have no limiting principles.

41.     While Mr. Olsen and his attorney Mr. Nelson have not yet cited any specific case law precedent in any of their filings with the Multnomah County Circuit Court, the trial Court (Hon. Judge Henry) cited *'Beal v. Beal'* and its progeny comprise the precedent case law which could plausibly support Mr. Olsen's alleged domestic partnership claims.  The precedent set by *'Beal v. Beal'* has been from the outset a controversial, activist workaround to enable Oregon courts to break with a previous, longstanding "clean hands" doctrine, giving litigants and judges a *de facto* common law marriage and dissolution construct, even though the litigators in these cases go to great lengths to deny that the parties are involved in any common law marriage. Notably, *'Beal v. Beal'* exists 100% outside of Oregon Statutory Law, and has never been reconciled with Oregon legislative statutes, precisely because doing so would precipitate a legal crisis in Oregon.  In other words, *'Beal v. Beal'* is quasi-extralegal case law precedent.

42.     Abuse of this extralegal Oregon case law by the Defendants using local Montana District courts, its vested powers as title agents, and Montana State Bar Association licensed trial lawyers has and will continue to have devastating consequences for Mr. Gabriel and any other unwitting party to an alleged claim of implied or unregistered domestic partnership with real property in Oregon.  Among other things, disproving such an allegation requires tremendous expense, time, resources, and outrageous violations of personal privacy.

43.     Specifically, Mr. Olsen through his attorneys has stated that his goals are to: a) liquidate Mr. Gabriel's properties; b) evict Mr. Gabriel from his Montana home; c) swirl together the parties' previous real property contributions, inputs, labor, investments and incurred debts for purposes of 'dissolution'; d) nullify Mr. Gabriel's property management agreement with Zurc Capital, LLC, which affords Mr. Gabriel limited vacation rental income while he is traveling for work; and e) place Mr. Olsen in sole custody of two jointly owned properties while arranging their sale, including Mr. Gabriel's Montana residence; and f) divide the proceeds of all liquidated assets unequally and to the financial advantage of Mr. Olsen, which effectively would result in a massive wealth and balance sheet transfer from Mr. Gabriel to Mr. Olsen.  Defendant DORINDA SUE GRAY ("M/r/s. Gray") has proactively joined these efforts using the authorities vested in her by her employer, Defendant INSURED TITLES, LLC /DBA INSURED TITLES, for an undisclosed payment or commission. (*See* **Exhibit 27**, attached here.)

44.     The Defendants' reckless, uninformed abuse and extralegal enforcement of this controversial case law not only gravely threatens the financial well-being of Plaintiff Mr. Gabriel; it is also unconstitutional.  The construct of 'unregistered domestic partnership' in which one party (Mr. Gabriel) is unwittingly and forcibly conscripted into a *de facto* marital or domestic partnership contract in a state (Oregon) in which he does not reside and without his consent violates the Due Process Clause of the Fourteenth Amendment to the US Constitution, by depriving Mr. Gabriel his fundamental right to make decisions concerning his life, his future, his property and his residency.  In other words, the Due Process Clause of the Fourteenth Amendment gives all adult US citizens the "right not to marry"[2] via substantive due process, or ***not*** to otherwise be conscripted into a related construct (i.e., 'domestic partnership'), foiling any clever workarounds that may have been or may soon be invented by radical attorneys – with the assistance of activist judges – in creative jurisdictions such as Oregon. (Emphasis added.)

---

[2] Kaiponanea T. Matsumura, *'A Right Not to Marry'*, 84 Fordham L. Rev. 1509 (2016).  Available at: https://ir.lawnet.fordham.edu/flr/vol84/iss4/11

# **ARGUMENTS**

## A.     **The Right Not to Marry**

45.     In *'Obergefell v. Hodges'*[3] the Court held that "the right to marry is protected by the Constitution" under the Due Process Clause. In its ruling, the majority gave four reasons for this: (1) marriage is "inherent in personal autonomy", (2) marriage is a "union unlike any other in its importance to" the parties, (3) the right to marry connects to the right to make decisions about family, procreation, and childrearing, and (4) marriage is a "keystone of our social order".

46.     In the United States, many legal scholars and authorities subscribe to the notion that the U.S. Constitution enshrines certain fundamental rights that arise by its express terms or through implication. Today, the idea of fundamental rights is enforced through Section 1 of the Fourteenth Amendment of the Constitution (*See* U.S. Const. amend. XIV, § 1), which reads:

> "*All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.*"

47.     The Supreme Court has contributed to this federalization of domestic relations laws by "constitutionalizing" family law. It has repeatedly used the U.S. Constitution, in particular the Fourteenth Amendment, to extend constitutional privacy protections to increasing numbers of persons and to invalidate state laws in areas of law previously thought to be the exclusive province of state legislatures and state courts.

48.     Furthermore, starting with *'Shelley v. Kraemer'*, 334 U.S. 1, 13 (1948), Federal courts have clarified that State actions of a particular character are prohibited.  While individual invasion of individual rights is not the subject-matter of the Fourteenth Amendment, it has a

---

[3] *Obergefell v. Hodges,* 576 U.S. ——, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015)

deeper and broader scope in that it nullifies and makes void all State legislation, and State action of every kind, including precedent case law, which impairs the privileges and immunities of citizens of the United States, or which injures them in life, liberty or property without due process of law, or which denies to any of them the equal protection of the laws.

49.    The U.S. Supreme Court has interpreted the Constitution to recognize the existence of several fundamental rights that were not expressly stated, including an individual's right to marry.  As eloquently argued by Kaiponanea T. Matsumura in *'A Right Not to Marry'*, 84 Fordham L. Rev. 1509 (2016), "State actions that compel marriage can be seen as falling on a spectrum from minimal interventions, like creating legal incentives for people to marry (for example, by providing favorable inheritance, tax, evidence, and tort rules to married couples), to maximal ones (like requiring marriage between unwilling participants). These actions differ both in terms of the degree of coercion and the nature of state intervention."

50.    Matsumura continues, "Depending on which state actions the right not to marry would prevent, that right can also be understood as falling along a spectrum. For example, the recent framing of the right to marry in terms of "personal choice" and "individual autonomy" (*Obergefell*, 135 S. Ct. at 2597, 2599) leaves little doubt that the Fourteenth Amendment would recognize, at the very least, some right not to marry—it is unlikely that the state could pair off unmarried strangers and deem them legally married over their objection."

51.    Finally, Matsumura writes, "If the right not to marry is thought of as freedom from state-imposed marriage, the autonomy interests become symmetrical with the interests protected by the right to marry. Choosing to marry only takes on meaning because of the freedom to choose not to marry.  Although the state may prefer one choice over the other, the choice in either direction has the same valence from the perspective of self-definition and autonomy."

52.    Under Oregon statutory law, marriage and domestic partnerships are treated identically for the purposes of dissolution (*See* Oregon Revised Statutes, "ORS" Chapter 107 –

'*Marital Dissolution, etc.*'), and also as evidenced by the repeated invocation of ORS Chapter 107 by the attorney for Mr. Olsen, Mr. Nelson, in his '*Summons*' and throughout his originally served lawsuit on March 22, 2022.

53. In *Zablocki v. Redhail*, 434 U.S. 374, 386 (1978), the court noted the importance of "the decision to enter the relationship that is the foundation of the family in our society"). Thus, the right not to marry (or in the instant case, not to be involuntarily conscripted into an Oregon domestic partnership) is justified by an additional, related value.   In its purest form, the right would entail freedom from state interference in "matters of family life" that are protected by the Due Process Clause.  In safeguarding a range of related "intimate and personal" choices, the Court has noted that "[b]eliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State." This concept of noninterference characterizes the privacy rights recognized under the Due Process Clause.[4]  While the Obergefell majority's theory of autonomy and identity envisions the right to marry moving in the direction of a positive right, a negative right not to marry would still rest on more solid conceptual ground."[5]  All of these arguments apply to some degree or another to the right to enter into a domestic partnership subject to any state's laws, and inversely the right not to.

**B.    State Responses to '*Obergfell*'**

54. Per Matsumura, "Despite their differences, nonmarital relationships—from municipal registries, to state employment benefits, to state alternatives to marriage—all exist in what Professor Douglas NeJaime has called a "dialogical relationship" with marriage[6]; these

---

[4] *See* Cass R. Sunstein, '*The Right to Marry*', 26 CARDOZO L. REV. 2081, 2089–94 (2005); note 20, at 2094 ("For the ordinary privacy rights with which marriage is associated, the Constitution requires governmental noninterference; it does not require the government to provide money, institutional arrangements, or anything else.")

[5] *See* Matsumura, '*A Right Not to Marry*', 84 Fordham L. Rev. 1509 (2016) notes 127–30 and accompanying text. (concluding that the right to marry protects equal access to whatever rights a state elects to associate with marriage, rather than a positive right to marriage). Available at: https://ir.lawnet.fordham.edu/flr/vol84/iss4/11

[6] Douglas NeJaime, '*Before Marriage: The Unexplored History of Nonmarital Recognition and Its Relationship to Marriage*', 102 CAL. L. REV. 87, 111 (2014).

statuses arose in the shadow of, in imitation of, and sometimes in opposition to, the institution of marriage.[7] The arrival of nationwide marriage equality therefore calls into question their reasons for being and leaves their future existence in jeopardy." Thus, in this instant lawsuit, Plaintiff Mr. Gabriel hereby calls into question the reason for Oregon's *'Beal v. Beal'* and its progeny.

55.    Matsumura continues, "Many jurisdictions have already phased out existing nonmarital statuses like domestic partnerships and civil unions or are moving in that direction.[8] These jurisdictions have not only closed the statuses to future registrants, but have eliminated them altogether." Thus, the reasoning behind the original decision in *'Beal v. Beal'* and subsequent cases in Oregon becomes impossibly thin, post-*Obergefell*, and cannot now withstand a confrontation with the Due Process Clause of the Fourteenth Amendment.

## C.    Liberty, Identity, Privacy, Dignity, Consent and Personal Autonomy

56.    The liberty and personal autonomy arguments surrounding marriage and legal domestic partnerships reached their zenith in the Court's latest discussion of the right to marry in *'Obergefell'*.  Justice Kennedy's majority opinion starts from the lofty premise that the "liberty" protected by the Fourteenth Amendment extends to "personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." (*'Obergefell v. Hodges'*, 135 S. Ct. 2584, 2597 (2015).  Several principles explain why the right to marry falls within this concept of liberty.  First, the choices "whether and whom to marry" are "among life's momentous acts of self-definition." (*Id.* at 2599 (quoting *'Goodridge v. Dep't of Pub. Health'*, 798 N.E.2d 941, 955 (Mass. 2003)).  Thus, because these decisions are "inherent in the concept

---

[7] Melissa Murray, *'Paradigms Lost: How Domestic Partnership Went from Innovation to Injury'*, 37 N.Y.U. REV. L. & SOC. CHANGE 291, 294–96 (2013).

[8] *See* generally WASH. REV. CODE § 26.60.010 (2014). *See also* 2012 Wash. Sess. Laws 203 ("[A]ny state registered domestic partnership in which the parties are the same sex, and neither party is sixty-two years of age or older, that has not been dissolved or converted into a marriage by the parties by June 30, 2014, is automatically merged into a marriage and is deemed a marriage as of June 30, 2014." *See also* CONN. GEN. STAT. § 46b-38rr (2009) (converting existing civil unions to marriages after October 1, 2010); *see also* 'Act Implementing the Guarantee of Equal Protection', 2009 Conn. Acts No. 9-13 § 12(a). *See also* DEL. CODE ANN. tit. 13, § 218 (2013); see also *'Civil Marriage Equality and Religious Freedom Act of 2013'*, 79 Del. Laws ch. 19, § 6 (2013). *See also* N.H. REV. STAT. ANN. § 457:46 (2010).

of individual autonomy"—and, indeed, they "shape an individual's destiny"—they are constitutionally protected. (*Id.*)

57.    In *'Obergefell'*, the Court tells us that "by the time of the Nation's founding [marriage] was understood to be a voluntary contract." (*Id.*)

58.    The same is true of domestic partnerships in Oregon.  Under Oregon statutory law governing domestic partnerships, Oregon Revised Statutes (hereafter "ORS") Chapter 106, which spells out Oregon's statutory law governing the establishment of domestic partnerships, in particular 106.325 (5) (d):

> *"(5) On the Declaration of Domestic Partnership, each individual who wants to become a partner in a domestic partnership shall:*
>
> *(...) (d) State that the individual **consents** to the jurisdiction of the circuit courts of Oregon for the purpose of an action to obtain a judgment of dissolution or annulment of the domestic partnership or for legal separation of the partners in a domestic partnership, or for any other proceeding related to the partners' rights and obligations, even if one or both partners cease to reside in, or to maintain a domicile in, this state; (...)"*

59.    What is remarkable about this statute is that Oregon law makes it abundantly clear that **consent** is required to enter into a domestic partnership in Oregon, and further suggests that residency is required (i.e., "*cease(s) to reside in* [Oregon]"). (Emphasis added.)

60.    ORS 106.315 ('Prohibited and void domestic partnerships') also states: "2. When either party to a domestic partnership is incapable of making the civil contract or ***consenting to the contract*** for want of legal age ***or sufficient understanding***, or ***when the consent of either party is obtained by force or fraud***, the domestic partnership is void from the time it is so declared by a judgement of a court having jurisdiction of the domestic partnership. [2007 c.99 §4; 2009 c.561 §2; 2015 c.629 §10]." (Emphasis added.)  Surely this statute, by extension, would apply to

the period before the court's ruling if such a contract was "created" by fraud and without the unwitting party's consent and understanding.

### D.    Conscriptive Approaches to Cohabitant Obligations; Fraud; Uncertainty

61.    In *'Is Consent Necessary? An Evaluation of the Emerging Law of Cohabitant Obligation'*[9], UCLA legal scholar Marsha Garrison investigates the extent to which adoption of a conscriptive approach to cohabitant obligation would "mar the symmetry of the legal structure" and examines those "considerations of history or custom or policy or justice" that might justify an asymmetrical law of family obligation.  Garrison explains why "our law has relied on commitment as a determinant of marital obligation and evaluates possible justifications for the conscriptive approach", and concludes that "those justifications are clearly inadequate to support conscriptive rules for cohabitants who do not have common children and that, while the case of cohabitants with common children is more complex, conscriptive rules would almost certainly work more harm than good even for this limited group."

62.    Garrison continues, "The contrasting relational perspectives of cohabitants and married couples emerge in many ways, but attitudes toward money are particularly revealing. Blumstein and Schwartz, who conducted a pioneering survey of American couples, analyzed responses to a range of questions on sharing and concluded that "married couples unconsciously assume a commingling of money and... cohabitors assume separate finances."[10]

63.    Garrison then poses the pivotal question, *"Does It Make More Sense to Require Cohabiting Couples to Contract Out or Contract In?"* by devoting an entire chapter to the topic, writing, "The evidence on equivalence establishes that it would be grossly unfair to treat all or even most cases of cohabitation like marriage: despite a small number of marriage-like relationships, cohabitants typically do not see their relationships as marital and do not behave like married couples;" and further, and in particular:

---

[9] 52 UCLA L. Rev. 815 (2005)
[10] *See* PHILIP BLUMSTEIN & PEPPER SCHWARTZ, *'American Couples: Money, Work, Sex'* (1983), 98, at 98.

*"The decline of common law marriage reflects the sad fact that litigation based determination of marital commitment "leads to fraud and uncertainty in the most important of human relationships.[11] Unsurprisingly, more complex formulations of the requirements for a common law marriage produce more fraud and uncertainty than simpler ones. Even a five-factor requirement list led appellate Judge Jackson of Utah to expostulate that, "[in litigation[,] each element becomes a source of dispute." Judge Jackson urged "a simpler scheme with fewer elements" if the legislature "wants to keep some form of common-law marriage,"[12] but his clear preference was abolition of the doctrine outright: "Most American states have already experimented with this doctrine. Based on their experience, all but ten have repealed common-law marriage. Utah should not recycle this great experiment."[13]*

64.    In the immediate, pending Oregon domestic partnership dispute between Mr. Gabriel and Mr. Olsen, Mr. Nelson (attorney for Mr. Olsen) hinges his lawsuit on the pivotal claims, promoted heavily in Mr. Olsen's various filings in Multnomah County Circuit Court (State of Oregon) Case No. 22DR04942, including and in particular *'Petitioner's Response to Defendant's Motions to Dismiss'* that "the parties spent years together representing themselves as a marital couple … to the world and in acquiring property jointly", arguing that the dissolution of the alleged domestic partnership is "no different than any other dissolution of marriage."

65.    On this point, Garrison opines, "The common law marriage "experiment" demands factual inquiry into only two issues, whether there was a present agreement to be married and whether the couple publicly held themselves out as married. If these two facts are so hard to determine that the potential for fraud and uncertainty outweighs the benefit of the doctrine, then

---

[11] *See* HOMER H. CLARK, JR., THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES 48 (2d ed. 1987), note 22, at 59.  *See also* Cynthia Grant Bowman, *'A Feminist Proposal to Bring Back Common Law Marriage'*, 75 OR. L.REV. 709, 731-50 (1996). Bowman reviewed historical data and concluded that the abolition of common law marriage reflected the elimination of the "frontier conditions" rationale for informal marriage; fears of fraud in the transmission of property; a desire to protect marriage and the family against alternative forms of sexual unions; racism and eugenics; the movement to maintain vital statistics and enforce various health-related requirements for marriage through the licensing process; and administrative and judicial efficiency.
[12] *'Kelley v. Kelley'*, 9 P.3d 171, 184 (Utah Ct. App. 2000) (Jackson, J., dissenting).
[13] *Id*. at 185 (Jackson, J. dissenting)

one must assume that the "anything relevant to life as a couple" approach of the *De Facto Relationships Act of New Zealand'*[14] or 'American Legal Institute Principles'[15] (as examples) would produce even more ***fraud and uncertainty***, with even less offsetting benefit." (Emphasis added).

66.    With respect to Garrison's above-referenced point that litigation-based determination of marital or domestic partnership commitment "leads to fraud and uncertainty", it is important to note that if an Oregon court were to decide that Mr. Olsen and Mr. Gabriel were in a domestic partnership subject to dissolution under Oregon law, then Mr. Olsen in particular would be potentially found guilty of committing fraud on multiple counts by his lender SNMC, along with all governing authorities with relevant statutes defining mortgage fraud.

67.    Per federal mortgage lending regulations guided by FinCEN and as enforced by FERA (Fraud Enforcement and Recovery Act of 2009), so too could be initiated criminal Department of Justice (hereinafter "DOJ"), Federal Bureau of Investigation (hereinafter "FBI"), Federal Trade Commission (hereinafter "FTC"), Department of Housing and Urban Development (hereinafter "HUD") and Securities and Exchange Commission ("hereinafter "SEC") probes into Mr. Olsen's written stated denial of the existence of any domestic partnership to his mortgage lender, SNMC, during SNMC's application, underwriting, closing and title recording phase – a lender which then sold the mortgage loan to PNC Bank ("PNC") – statements made all while Mr. Olsen conversely sues Plaintiff Mr. Gabriel using directly contradictory claims.

E.    **Federal Court Venue, Subject Matter Jurisdiction**

68.    Beginning with the Warren Court in the mid 1960s, Supreme Court decisions have affected nearly every area of family law, transforming what had been seen as ordinary state-

---

[14] *'Property (Relationships) Amendment Act, 2001'* (N.Z), available at http:///www.legislation.govt.nl. For descriptions of the legislation and its development, *see* Bill Atkin, The Challenge of Unmarried Cohabitation-The New Zealand Response, 37 FAM. L.Q. 303 (2003); Virginia Grainer, *'What's Yours Is Mine: Reform of the Property Division Regime for Unmarried Couples in New Zealand'*, 11 PAC. RIM L. & POL'Y J. 285 (2002).
[15] AM. LAW INST., PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION: ANALYSIS AND RECOMMENDATIONS ch. 6 (2002).

regulated family issues—regulation of marriage, criminal laws on contraception, etc.—into constitutional issues of equality, privacy, and federalism. Over 100 Supreme Court cases have dealt with such issues as establishing and terminating parental status; child abuse and neglect; marriage; jurisdiction for divorce, alimony, division of property, child custody, and child support; family property rights such as homestead, pensions, and insurance proceeds; family living arrangements; child custody and visitation; and child rearing. The Supreme Court has set the framework for examining domicile, jurisdiction, and full faith and credit issues for recognizing sister state divorce decrees.

69.    As argued previously, starting with *Shelley v. Kraemer*, 334 U.S. 1, 13 (1948), Federal courts have clarified that State actions of a particular character is prohibited:  "While individual invasion of individual rights is not the subject-matter of the Fourteenth Amendment, it has a deeper and broader scope in that it nullifies and makes void all State legislation, and State action of every kind, including precedent case law, which impairs the privileges and immunities of citizens of the United States, or which injures them in life, liberty or property without due process of law, or which denies to any of them the equal protection of the laws."

70.    This ongoing constitutionalization of family law is likely to continue because the Supreme Court appears willing to recognize new rights protected by substantive due process. In addition, the protection is not limited to traditional families. As families become even more diverse and problems more complex, the Supreme Court (hereinafter "SCOTUS") is likely to be the final voice, although lower Federal courts are equally proper venues to hear cases that are not challenged all the way up to SCOTUS, or which are unlikely to be taken up by SCOTUS.

**F.    Implied Intent; Abolition of Common Law Marriage**

71.    Here it is important to cite among other national trends the effective abolition of common law marriage via such landmark cases as *PNC Bank Corp. v. W.C.A.B.* (Stamos), 831 A.2d 1269 (Pa. Commw. Ct. 2003) and *Stone v. Thompson*, 428 S.C. 79, 82, 833 S. E.2d 266, 267

(July 24, 2019)[16].  Taken together, these recent rulings and others have effectively abolished common law marriage nationwide, including, as argued in this instant case, such related constructs as implied domestic partnership – particularly following the '*Obergfell v. Hodges'* SCOTUS decision.  The legal reasoning of the Courts has consistently been that, following '*Obergfell'* and other statutory and case law revisions governing common law marriage, there is no basis for the Courts to determine implied **intent** of the parties when the avenues for filing for marriage or domestic partnership are readily, easily and cheaply available – and without impediment, in any state – to anyone who intends such an arrangement. (Emphasis added.)

### G.    Federal Court Intervention and the '*Younger'* Abstention.

72.    The following paragraphs are lifted from Hon. Judge Dana L. Christensen's thoughtful opinion supporting a Federal court Order dated January 26, 2024, in a related, now-dismissed, somewhat analogous lawsuit brought by Plaintiff Mr. Gabriel against Mr. Olsen as an individual.  *See* Case No. CV 23-142-M-DLC (US District Court, Montana – Missoula Division):

"Younger stands for the proposition that federal courts should avoid interfering with ongoing state

---

[16] "We find the Pennsylvania court's reasoning and other considerations sufficiently persuasive to adopt a bright-line rule requiring those who wish to be married in South Carolina to obtain a lawful license. Our law contains similar provisions regarding child support, inheritance, and the ceremonial marriage process. *See* S.C. Code Ann. §§ 20-1-210 to -240 (1976); §§ 62-2-101 to -109 (1976 & Supp. 2018); § 63-5-20 (1976 & Supp. 2018). (…) The current case is emblematic of this shift, as the parties' community of friends was wholly unconcerned with their marital status, and indeed several of their witnesses were in similar relationships. Meanwhile, courts struggle mightily to determine if and when parties expressed the requisite intent to be married, which is entirely understandable given its subjective and circumstantial nature. The solemn institution of marriage is thereby reduced to a guessing game with significant ramifications for the individuals involved, as well as any third party dealing with them." *(…)*

"Critically, non-marital cohabitation is exceedingly common and continues to increase among Americans of all age groups. The right to marry is a fundamental constitutional right, *Obergefell v. Hodges* , ––– U.S. ––––, 135 S. Ct. 2584, 2604-05, 192 L.Ed.2d 609 (2015), which leads us to believe the right to remain unmarried is equally weighty, particularly when combined with our admonitions that a person cannot enter into such a union accidentally or unwittingly, *Callen v. Callen* , 365 S.C. 618, 626, 620 S.E.2d 59, 63 (2005). Further, we must agree with the many observers who have noted that common-law marriage requirements are a mystery to most. The present case is again illustrative. None of the multiple witnesses who were asked understood what was required to constitute a common-law marriage, despite the fact that, as mentioned, several were involved in lengthy cohabitating relationships themselves. Moreover, two of such partners testified in complete opposition to one another, with one reporting they were common-law married, and the other stating emphatically they were not. This further persuades us to reject a mechanism which imposes marital bonds upon an ever-growing number of people who do not even understand its triggers." *Stone v. Thompson*, 428 S.C. 79, 85-86 (S.C. 2019)

criminal, civil, and administrative proceedings." *See* Arevalo v. Hennessy, 882 F.3d 763, 765 (9th Cir. 2018) ("*Younger* cautions against federal interference with ongoing state criminal, civil, and administrative proceedings."). *Younger* abstention in civil cases "is appropriate only when the state proceedings: (1) are ongoing, (2) are quasi-criminal enforcement actions or involve a state's interest in enforcing the orders and judgments of its courts, (3) implicate an important state interest, and (4) allow litigants to raise federal challenges." *See* Cook v. Harding, 879 F.3d 1035, 1039 (9th Cir. 2018). Where these factors are met, *Younger* provides an exception to this Court's typical obligation to exercise jurisdiction where it exists. *See* Arevalo, 882 F.3d at 765. The Court may raise the abstention doctrine sua sponte.  *See* H.C. ex rel. Gordon v. Koppel, 203 F.3d 610, 613 (9th Cir. 2000).

73.    Again quoting Hon. Judge Dana Christensen: "Applying the above factors, the *Younger* abstention ***does not apply*** (Emphasis added.)  The first, third, and fourth factors are all met in this case.  The Oregon state court dissolution proceedings are ongoing.  Oregon has a strong interest in matters of family relations—a "traditional area of state concern," over which the state "has a vital interest in protecting the authority of the judicial system." *See* H.C. ex rel. Gordon, 203 F.3d at 613.  And Plaintiff could raise the same challenges to the domestic partnership proceedings in the course of the state court matter. *See* Martinez v. California, 444 U.S. 277, 283 n.7 (1980) (42 U.S.C. § 1983 action brought in state court); Cook, 879 F.3d at 1038 (same).  Regarding the second factor, the Ninth Circuit has made clear that "*Younger* abstention is improper in civil cases outside of . . . two limited categories" – quasicriminal enforcement actions or actions involving a state's interest in enforcing the orders and judgments of its courts – "regardless of the subject matter or the importance of the state interest." *Id.* at 1039. The Ninth Circuit has further explained that "federal courts cannot ignore [these] strict limitations on *Younger* abstention simply because states have an undeniable interest in family law." *Id.* at 1040.

74.    *(Continued from Judge Christensen's Order):* "The Oregon state court action is not quasi-criminal; however, the question of whether the case implicates Oregon's interest in enforcing the orders and judgments of its courts is a closer question. "The Supreme Court and [Ninth Circuit] have held that this [second category] is geared to ensuring that federal courts do not interfere in the procedures by which states administer their judicial system and ensure compliance with their judgments." *See* Rynearson v. Ferguson, 903 F.3d 920, 926 (9th Cir. 2018). The Ninth Circuit has repeatedly cautioned against applying Younger abstention except in "extraordinary and narrow" circumstances. *See*, e.g., Nationwide Biweekly Admin., Inc. v. Owen, 873 F.3d 716, 727 (9th Cir. 2017). For example, in Cook, the Ninth Circuit reversed the district court's application of Younger abstention in the context of constitutional challenges to Cal. Fam. Code § 7962 raised simultaneously in both state and federal court proceedings. 879 F.3d at 1038. The court reasoned that "an argument regarding the state courts' power to apply its laws in subsequent proceedings and the state's interest in its interrelated family laws . . . do[] not relate to the state courts' ability to enforce compliance with judgments already made." *Id.* at 1041. Here, the Oregon action does not relate to the state courts' ability to enforce compliance with judgments already made and Plaintiff does not challenge "the processes by which the State compels compliance" with the judgments of its courts. *See* Cook, 879 F.3d at 1041 (emphasis added); *see also* Sloatman v. Housewright, No. 2:21-cv-08235-WLH (MAA), 2023 WL 8852375, at *6 (C.D. Cal. Nov. 17, 2023) (concluding that a "divorce action does not fall into one of the two "exceptional categories" of civil cases warranting Younger abstention"). Accordingly, the Court concludes that Younger's abstention doctrine does not apply in this matter."

## **FIRST CLAIM FOR RELIEF**

**Defendant's enforcement of domestic partnership case law in Oregon
violates the Plaintiff's substantive due process rights, rights of liberty,
dignity, privacy and autonomy guaranteed by the Fourteenth Amendment**

75.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 74 as if fully set forth herein.

76.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

77.    As previously articulated by Justice Kennedy's majority opinion in *'Obergefell'*, "liberty" as protected by the Fourteenth Amendment extends to "personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs."

78.    As established herein, SCOTUS further held that several principles explain why the right to marry falls within this concept of liberty (*'Obergefell'*, 135 S. Ct. at 2597, 2599). First, the choices "whether and whom to marry" are "among life's momentous acts of self-definition." Thus, because these decisions are "inherent in the concept of individual autonomy"—and, indeed, they "shape an individual's destiny"—they are constitutionally protected.

79.    As argued herein, the right not to marry or enter into a legal domestic partnership is justified by an additional, related value. In its purest form, the right would entail freedom from state interference in "matters of family life" that are protected by the Due Process Clause.[17]

80.    In safeguarding a range of related "intimate and personal" choices, the Court majority in *'Obergefell'* has noted that "[b]eliefs about these matters could not define the

---

[17] *See 'Zablocki v. Redhail'*, 434 U.S. 374, 386 (1978); see also *id.* (noting the importance of "the decision to enter the relationship that is the foundation of the family in our society").

attributes of personhood were they formed under compulsion of the State." This concept of noninterference characterizes the privacy rights recognized under the Fourteenth Amendment.[18]

81.    All of these arguments apply to some degree or another to the right to enter into a domestic partnership subject to any state's laws, and inversely the right not to.

82.    In *'Obergfell'*, the Court tells us that "by the time of the Nation's founding [marriage] was understood to be a voluntary contract". The same is true of domestic partnerships in Oregon. The Oregon trial court's ruling under *'Beal v. Beal'* would forcibly conscript Plaintiff Mr. Gabriel into a domestic partnership resembling a *de facto* marriage starting in 2011, against his will and without his prior knowledge, thus depriving Mr. Gabriel of basic human agency.

83.    The State of Oregon, by refusing to dismiss Mr. Olsen's domestic partnership claims under the overreaching *'Beal v. Beal'* precedent and its progeny, thereby underwrites Mr. Olsen's abuse of controversial Oregon case law and precedent in the process of violating Plaintiff Mr. Gabriel's substantive due process rights under the Fourteenth Amendment[19].

84.    Under Oregon Statutory Law (hereinafter, "ORS") governing domestic partnerships, ORS Chapter 106, which lays out statutory law governing the establishment of domestic partnerships, in particular 106.325 (5) (d), which requires "*that the individual **consents** to the jurisdiction of the circuit courts of Oregon for the purpose of an action to obtain a judgment of dissolution or annulment of the domestic partnership or for legal separation of the partners in a domestic partnership, or for any other proceeding related to the partners' rights*

---

[18] *See* Cass R. Sunstein, *'The Right to Marry'*, 26 CARDOZO L. REV. 2081, 2089–94 (2005); note 20, at 2094 ("For the ordinary privacy rights with which marriage is associated, the Constitution requires governmental noninterference; it does not require the government to provide money, institutional arrangements, or anything else.")

[19] In footnote 4 of <u>*U.S. v. Carolene Products, 304 U.S. 144 (1938)*</u>, the Supreme Court indicated that substantive due process would apply to: "rights enumerated in and derived from the first Eight Amendments to the Constitution, the right to participate in the political process, such as the rights of voting, association, and free speech, and the rights of 'discrete and insular minorities.'" Following *Carolene Products*, the U.S. Supreme Court has determined that fundamental rights protected by substantive due process are those deeply rooted in U.S. history and tradition, viewed in light of evolving social norms. These rights are not explicitly listed in the <u>Bill of Rights</u>, but rather are the penumbra of certain amendments that refer to or assume the existence of such rights. This has led the Supreme Court to find that personal and relational rights, as opposed to economic rights, are fundamental and protected.

*and obligations, even if one or both partners cease to reside in, or to maintain a domicile in, this state;"* Oregon law makes it abundantly clear that **consent** is required to enter into a domestic partnership in Oregon, and further suggests that residency is required (i.e., "*cease(s) to reside in* [Oregon]"); Plaintiff Mr. Gabriel has never consented to this, and there is no evidence of consent. (Emphasis added.)

85.    To the extent that the trial Court's Order runs afoul of ORS 106.315 ('Prohibited and void domestic partnerships'), this would preclude the Court from conscripting Mr. Gabriel into a domestic partnership against his will and without his knowledge.  ORS 106.315 states: "2. When either party to a domestic partnership is incapable of making the civil contract or **consenting to the contract** for want of legal age **or sufficient understanding**, or **when the consent of either party is obtained by force or fraud**, the domestic partnership is void from the time it is so declared by a judgement of a court having jurisdiction of the domestic partnership. [2007 c.99 §4; 2009 c.561 §2; 2015 c.629 §10]."  Surely this statute, by extension, would apply to the period before the court's ruling if such a contract was "created" by fraud and without the unwitting party's consent and understanding. (Emphasis added.)

86.    Accordingly,  Plaintiff Mr. Gabriel is entitled to declaratory and injunctive relief.

87.    Without injunctive relief from Defendants' reckless abuse and attempted enforcement of the State of Oregon's unconstitutional domestic partnership case law (e.g., *'Beal v. Beal'*), Plaintiff will continue to suffer irreparable harm, undue burden and expense in the future, and a clear violation of his substantive due process rights under the Fourteenth Amendment of the United States Constitution.

### SECOND CLAIM FOR RELIEF

**Violation of the Contracts Clause, Art. I, section 10
of the United States Constitution as incorporated and made
applicable to states by the Fourteenth Amendment**

88.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 87 as if fully set forth herein.

89.    Plaintiffs' property management contract with Zurc Capital, LLC (hereinafter "Zurc Capital") and Zurc Capital's 'AirBNB' rental relationships with its tenants are controlled by contracts, including rental agreements (the "Contracts"), all of which are enforceable contracts within the meaning of Article I, section 10. 35.  The Contracts obligate Zurc Capital's short-term vacation renters to pay lodging and other related expenses in exchange for the right to occupy portions of Plaintiffs' premises while he travels for business.  The Contracts also provide for various means of enforcing that payment obligation, including the imposition of late fees and penalties and right to terminate the tenancy and recover possession of the premises.

90.    Defendants' misuse of Oregon and Montana family law courts to ensnare real property and adjudicate real property disputes using Oregon's extralegal *Beal v. Beal'* case law precedent – specifically, Mr. Gabriel's residence in Montana, which is comprised of 6 acres and two autonomous cabins – substantially impairs Plaintiffs' contractual obligations with Zurc Capital, LLC, and by extension servicers such as 'AirBNB' (an e-commerce facilitation platform for vacation rentals) and thereby blocks, impairs or encumbers Mr. Gabriel's proper access to the revenue created by these contractual obligations.

91.    Further compounding pre-existing contractual matters, if an Oregon or Montana court were to conclude, even upon appeal, that Mr. Olsen and Mr. Gabriel were in a domestic partnership subject to dissolution under Oregon law, then Mr. Olsen (in particular) and also possibly Plaintiff Mr. Gabriel could be accused of committing mortgage fraud on multiple counts by his lender SNMC (Security National Mortgage Corporation), along with servicer PNC Bank, which purchased the loans from SNMC by relying on warranties made by SNMC and which contradict the fundamental, core claims supporting Mr. Olsen's domestic partnership lawsuit.

92.    Per federal mortgage lending regulations guided by FinCEN and as enforced by FERA (Fraud Enforcement and Recovery Act of 2009), so too could be initiated possible criminal Department of Justice (hereinafter "DOJ"), Federal Bureau of Investigation (hereinafter "FBI"), Federal Trade Commission (hereinafter "FTC"), Department of Housing and Urban Development (hereinafter "HUD") and Securities and Exchange Commission ("hereinafter "SEC") probes into Defendant Mr. Olsen's written stated denial of the existence of any domestic partnership to his mortgage lender, SNMC, during SNMC's application, underwriting, closing and title recording phase – a lender which then sold the mortgage loan to PNC Bank ("PNC") – statements made all while Mr. Olsen conversely sues Plaintiff Mr. Gabriel using directly contradictory claims.

93.    Without injunctive relief from the Defendants' reckless abuse of the State of Oregon's unconstitutional domestic partnership case law (e.g., *'Beal v. Beal'*), Plaintiff will continue to suffer irreparable harm in the future, and possibly even Mr. Olsen will incur irreparable harm inflicted upon him by his own lawsuit, insofar as his claims are potentially criminally fraudulent and would invoke criminal prosecution.

94.    The above violations of the United States Constitution give rise to both declaratory and injunctive remedies under the Federal Civil Rights Act, 42 U.S.C. § 1983.

95.    Plaintiff Mr. Gabriel is entitled to a declaration from this Court that the *'Beal v. Beal', etc.* case law precedents cited above and now invoked in Multnomah County Circuit Court Case No. 22DR04942 violate Article I, section 10, of the United States Constitution.

96.    Plaintiff Mr. Gabriel is entitled to an injunction directed to Defendants prohibiting any local Montana court enforcement or implementation of *'Beal v. Beal'* or any similar Oregon case law precedent governing so-called 'unregistered domestic partnerships' in Oregon.

97.    Plaintiff Mr. Gabriel is entitled to recover his reasonable costs and attorney fees incurred in bringing this action pursuant to 42 U.S.C. § 1988.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectively prays that this Court:

A. Enter a judgment declaring that Defendants, by improperly leveraging *'Beal v. Beal'* via the State of Oregon and its courts, has overreached in its attempted enforcement of Mr. Olsen's Oregon domestic partnership lawsuit in Montana, in particular that it:

    i. violates the Due Process Clause of the Fourteenth Amendment by infringing upon Plainiff's fundamental right to liberty, dignity, privacy, and personal autonomy, and is therefore void and unenforceable.

    ii. jeopardizes Plaintiff by potentially and needlessly implicating both the Plaintiff but also primarily Mr. Olsen in potential criminal mortgage fraud, were an Oregon court to conclude after appeal that a domestic partnership does exist in Oregon under *'Beal v. Beal'* and its progeny.

B. Issue preliminary and permanent injunctions enjoining Defendants, the local family law Courts in Montana, their legal counsel and those in active concert or participation with the State from pursuing or enforcing Mr. Olsen's marriage or domestic partnership claim, in any jurisdiction, and in particular Flathead County, Montana.

C. Waive the requirement for the posting of a bond of security for the entry of temporary and preliminary relief;

D. Award Plaintiff his costs and expenses, including reasonable attorneys' fees, pursuant to 42 U.S.C. U.S.C. § 1988 and all other applicable statutes and sources of law; and

E. Grant such other relief as the Court deems just and proper.

* * *

DATED this 26th Day of August, 2024.

Respectfully submitted,

Plaintiff, *Pro Se* (signature)

Ryan D. Gabriel
2000 Blacktail Rd. #1140
Lakeside, MT 59922
Tel:  (403) 606-5859 m.

Submitted by Ryan Dean Gabriel, *pro se*
(206) 391-9886